NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

PATRICK DWAYNE PORTER, *Appellant.*

No. 1 CA-CR 15-0461
FILED 8-18-2016

Appeal from the Superior Court in Maricopa County
No. CR2014-103039-001 SE
The Honorable Erin O. Otis, Judge *Pro Tempore*

**AFFIRMED AS CORRECTED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Mays Law Office, P.L.L.C., Phoenix
By Wendy L. Mays
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Donn Kessler joined.

---

**W I N T H R O P**, Judge:

¶1        Patrick Dwayne Porter timely appeals his convictions and sentences for six counts of armed robbery, class two dangerous felonies; six counts of kidnapping, class two dangerous felonies; six counts of aggravated assault, class three dangerous felonies; one count of kidnapping a child, a class two dangerous felony and dangerous crime against children; and one count of aggravated assault on a child, a class three dangerous felony and dangerous crime against children. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 13-1904(A)(1) (2010) (armed robbery), -1304(A)(3) (2010) (kidnapping), -1204(A)(2) (Supp. 2015) (aggravated assault).[1]  After searching the record on appeal and finding no arguable question of law that was not frivolous, Porter's counsel filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), asking this court to search the record for fundamental error.  This court granted counsel's motion to allow Porter to file a supplemental brief *in propria persona*, but he did not do so.  After reviewing the entire record, we find no fundamental error.  Therefore, we affirm Porter's convictions and sentences as corrected to reflect one additional day of presentence incarceration credit.

**FACTS AND PROCEDURAL BACKGROUND**[2]

¶2        Porter's charges arose from three robberies of cellular telephone companies.  The robberies occurred on November 8, 2013, November 22, 2013, and January 11, 2014.  Victim V.L. testified that on November 8, 2013, two males entered the cellular telephone retail store

---

[1]        Although the Arizona Legislature amended certain of the statutes cited in this decision after the dates of these offenses, the revisions are immaterial to the resolution of this appeal.  Thus, we cite to the current version of these statutes.

[2]        We view the facts in the light most favorable to sustaining the jury's verdict and resolve all reasonable inferences against Porter. *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

where he was working. One of the males, later identified as Porter, pointed a gun at V.L., pushed him against a wall, and demanded the money from the register. After taking the money, Porter demanded that V.L. show him where the phones were kept. V.L. took Porter to the back of the store, where Porter pushed him to the ground and zip-tied his hands and feet with the gun continuously pointed at him. V.L. identified Porter in court as the robber with the gun, the store's video surveillance footage showed the robbery occurring as V.L. described it, and Porter's DNA was found on the zip ties used on V.L. V.L. also testified that the robbers took approximately $280 and between ten and twenty phones.

¶3        M.G. testified that she and another employee, S.M., were working at a cellular telephone store on November 22, 2013, when two males entered the store wearing backpacks; one was wearing a black hoodie and the other was wearing a red-and-black jacket. The person in the red-and-black jacket—later identified as Porter—pulled out a gun, and the robbers demanded to know where the phones were kept. The robbers and employees went to the back of the store, and M.G. unlocked the cage containing the phones. The robbers filled their backpacks with phones and then locked M.G. and S.M. in the cage with a bike lock. Throughout the encounter, M.G. felt "[p]anic" and "fear." M.G. also testified that at the time of the robbery, Porter had a Band-Aid on his face, and that she was extremely close to Porter when he was retrieving phones from the cage. M.G. identified Porter in court as the robber with the gun in the red-and-black jacket.

¶4        S.M.'s testimony about the robbery was consistent with M.G.'s testimony. S.M. added that the person in the red-and-black jacket came behind her and held a gun to the back of her head and neck, and he pulled on the back of her shirt. S.M. also testified that Porter had a Band-Aid on his cheek in the location of his face tattoo, and that when she got close to him, she could see a tattoo hidden under the Band-Aid. S.M. stated she "was terrified" during the robbery. S.M. also identified Porter in court as the robber in the red-and-black jacket who pointed the gun at her. The store's video surveillance corroborated the stories of S.M. and M.G. A store manager testified that the robbers stole $35,540 worth of phones that day.

¶5        Matthew Elliot was arrested in connection with the robberies, and, following his arrest, he gave a "free talk" to police, during which he identified Porter as one of the robbers from all three robberies. During trial, Elliot testified he was involved in the November 22 robbery with Porter, and that he received texts that morning telling him to get ready for a robbery and to wear dark clothes and a low hat. Porter and another suspect then picked up Elliot and drove to the store location. Porter and Elliot went

into the store, and Porter eventually drew a gun and approached one of the employees. Elliot approached the other employee, and both employees were forced to the back of the store. Porter and Elliot left the store after filling their backpacks with phones, and Elliot received slightly more than $3,500 for his help in the robbery. Elliot also testified that the video surveillance accurately reflected what happened in the store. Elliot further testified that Porter was involved in all three robberies, and he identified Porter in the video surveillance from the other two robberies. In addition, Elliot testified that he saw zip ties and a Taser at Porter's apartment. Elliot also testified that when he was at Porter's apartment one day, he was given a phone that was stolen in the January 11, 2014 robbery. He also testified that he saw other brand new phones at Porter's residence. Detective McWilliams. confirmed that Elliot had one of the phones stolen in the January 11, 2014 robbery.

¶6        Detective McWilliams also testified that, during the execution of a search warrant at Porter's apartment, police recovered a red-and-black jacket that appeared identical to the jacket worn by Porter on the day of the November 22, 2013 robbery. After analysis, Porter's DNA was found on the red-and-black jacket.

¶7        Victim M.S. testified that, on January 11, 2014, she was at a cellular telephone store with her nine-year-old niece when two identically dressed males, both on their phones, entered the store. There were two employees on duty at the time, A.A. and J.B. One of the males approached J.B with a Taser, while the other male, later identified as Porter, pulled out a gun and pointed it at M.S.'s head. One of the robbers ordered everyone to the back room. In the back room, J.B. was ordered to open the safe, and all of the victims were ordered to lie down with their heads on the ground. After the robbers filled their backpacks with phones from the safe, one of them yanked M.S.'s purse from her hands, and then put M.S., her niece, A.A., and J.B. in the safe room, placed a table in front of the door, and exited through the back of the store. M.S. testified that she "was petrified" during the encounter, and her niece was crying throughout it. M.S. confirmed that the store's video surveillance accurately portrayed the robbery. Further, M.S. testified that when she attended Porter's initial appearance in this case, she immediately recognized Porter's voice as the voice of one of the robbers, and hearing "it brought everything [about the robbery] back." In addition, M.S. testified that having the gun pointed at her "was very traumatic," and that she feared she might be harmed by the weapons.

¶8        Victim J.B. testified that, during his shift at the cellular telephone store on January 11, 2014, someone came into the store acting unusual. According to J.B., approximately twenty minutes after that person

left the store, the robbers arrived. J.B.'s explanation of the robbery was consistent with M.S.'s explanation. J.B. added that one of the robbers struck him when he tried to look at his face, and also that the robbers took everyone's personal phones, including his. After the robbery, J.B. identified Porter in a photo lineup as the robber with the gun, and as the person acting unusual when he came in the store a few minutes before the robbery. The store manager testified that the robbers stole approximately $20,000 worth of phones that day.

**¶9**        A.A. testified that, on January 11, 2014, she was working with J.B. when they were robbed by two males wearing nearly identical outfits— khaki pants, black sweaters, and backpacks. A.A. also testified that she was "terrified" during the robbery, and that one of the robbers shook her and pointed a gun at her. Five days after the robbery, A.A. identified Porter in a photo lineup as the robber with the gun. A.A. also identified Porter in court as the robber with the gun.

**¶10**        In addition to recovering the red-and-black jacket during execution of the search warrant, police officers also recovered other items that appeared identical to the clothing worn by the robbers on January 11, including khaki pants and a black hoody. The police also recovered a Taser and zip ties identical to the ones used in the November 8, 2013 robbery. Detective McWilliams testified that, in viewing the surveillance videos from the November 22, 2013 robbery, he immediately noticed that the person identified as Porter appeared to be wearing a Band-Aid on the area of his face where he has a tattoo. Detective McWilliams further testified that several still images taken from the surveillance videos from all three robberies bore a strong resemblance to Porter.

**¶11**        The jury unanimously found Porter guilty on all twenty counts and found all twenty counts were dangerous. In addition, the jury found two aggravating factors applied to all twenty counts: the presence of an accomplice, and the commission of the offenses for pecuniary gain. After considering a probation violation report, a mitigation report, and comments from Porter's counsel and the State, the trial court sentenced Porter to thirty-eight years in prison and ordered that he pay $35,540 in restitution. The court also calculated 524 days as Porter's presentence incarceration credit. Porter was arrested, however, on January 17, 2014, and he remained in custody until sentencing on June 26, 2015. We therefore correct the court's sentencing minute entry to reflect 525 days of presentence incarceration credit. *See State v. Carnegie*, 174 Ariz. 452, 454, 850 P.2d 690, 692 (1993) (holding that presentence incarceration credit includes the day of booking).

**ANALYSIS**

**¶12**         We have reviewed the entire record for reversible error and find none. *See Leon*, 104 Ariz. at 300, 451 P.2d at 881. Porter received a fair trial. He was represented by counsel at all stages of the proceedings and was present at all critical stages.[3] The evidence presented at trial was substantial and supports the verdicts. The jury was properly comprised of twelve members, and the court properly instructed the jury on the elements of the charges, Porter's presumption of innocence, the State's burden of proof, and the necessity of a unanimous verdict. The trial court received and considered a probation violation report, Porter was given an

---

[3]         On March 2, 2015, Porter moved to dismiss counsel because of a claimed irreparable breakdown in communication and lack of client-attorney trust. Porter did not request to represent himself or request a new attorney, however. Although the record does not reflect whether the trial court addressed the motion, before his written motion, Porter requested dismissal of counsel at two conference hearings. Porter first requested dismissal of counsel at an October 10, 2014 hearing, and the court advised him that if he filed an appropriate written motion, it would address the issue then. The court also advised Porter that, in order to represent himself, he would need to agree that the laws of the State of Arizona would govern the proceedings, and that he would follow the rules of evidence and the court's direction. Porter insisted that Arizona is a corporation, that he is not subject to the court's jurisdiction, and that he would not enter a contract requiring him to follow the rules of the corporation. Porter again requested dismissal of counsel at a hearing on November 24, 2014, and he requested that his "legal counsel advisors" represent him. After the court questioned his advisors, they all confirmed they were not licensed to practice law in the State of Arizona, and the court advised them that they could not represent Porter.

Assuming the trial court denied Porter's motion by not addressing it, the denial was proper. Porter made a broad request to dismiss counsel without any specific factual basis. *See State v. Torres*, 208 Ariz. 340, 343, ¶ 7, 93 P.3d 1056, 1059 (2004) (stating that when an indigent defendant requests to represent himself or requests new counsel, he must make sufficiently specific, factually based allegations in support of his request). The trial court had already heard Porter's complaints about the court not having jurisdiction over him, and his references to Arizona as a corporation. Thus, by not raising any new grounds for dismissal of counsel in his written motion, the court properly denied the motion and did not need to inquire further.

opportunity to speak at sentencing and did so, and his sentences were within the range of acceptable sentences for his offenses.

## CONCLUSION

**¶13**      We decline to order briefing and affirm Porter's convictions and sentences as corrected.  After filing of this decision, defense counsel's obligations pertaining to Porter's representation in this appeal have ended. Defense counsel need do no more than inform Porter of the outcome of this appeal and his future options, unless, upon review, counsel finds an issue appropriate for submission to the Arizona Supreme Court by petition for review.  *See State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984).

**¶14**      Porter has thirty days from the date of this decision to proceed, if he wishes, with an *in propria persona* petition for review.  On the court's own motion, we also grant Porter thirty days from the date of this decision to file an *in propria persona* motion for reconsideration.



Amy M. Wood • Clerk of the court
FILED:  AA